# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 4, 2014

## IN RE CHRISTOPHER J. B., JR., ET. AL. [1]

**Appeal from the Juvenile Court for Cumberland County**
**No. 2013JV3390    Hon. Larry Michael Warner, Judge**

---

**No. E2014-00489-COA-R3-PT - Filed October 9, 2014**

---

This is a termination of parental rights case in which the Tennessee Department of Children's Services filed a petition to terminate Mother's parental rights to her three children. The trial court found that clear and convincing evidence existed to support the termination of Mother's parental rights on the statutory grounds of abandonment for failure to visit and provide support and failure to comply with the requirements contained in the permanency plans. The court further found that termination of her rights was in the best interest of the Children. Mother appeals. We affirm the trial court's termination of Mother's parental rights.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J. and THOMAS R. FRIERSON, II, J., joined.

Jeffrey Vires, Crossville, Tennessee, for the appellant, Marcia P.

Robert E. Cooper, Jr., Attorney General and Reporter, and Paul Jordan Scott, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

Ieshia M. Dupes, Jamestown, Tennessee, guardian ad litem for the minor children, Christopher J. B., Jr., David J. B., and Eva J. B.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

## OPINION

## I. BACKGROUND

Eva G. B. ("Eva"), David J. B. ("David"), Christopher J. B., Jr. ("Christopher") (collectively "the Children") were born to Marcia P. ("Mother") in October 1996, June 1998, and April 1999, respectively. Christopher B. ("Father") was identified as the father on each of the birth certificates. It was later determined that Franklin H. ("Biological Father") was actually the father of Eva and David.

At some point in 2007, the Children lived together with grandparents until David was sent to live with an aunt. The Children were later placed into the custody of the Tennessee Department of Children's Services ("DCS") after they were each found to be dependent and neglected. Eva was placed in custody in May 2011, David was placed in custody in March 2012, and Christopher was placed in custody in September 2012. The Children have remained in foster care since their initial placement into DCS custody.

DCS developed four permanency plans for Mother. These plans, dated June 23, 2011, January 18, 2012, April 16, 2012, and October 6, 2012, were ratified by the trial court. Pursuant to the plans, Mother was required, in pertinent part, to remit child support, attend visitation and provide food, drinks, and activities for the Children during visitation, complete an alcohol and drug assessment and follow all recommendations, complete a psychological examination and follow all recommendations, resolve legal issues, and refrain from incurring additional charges. On May 2, 2013, DCS filed a petition to terminate the parental rights of Mother, Father, and Biological Father to the Children.[2] Relative to Mother, DCS alleged termination on the statutory grounds of abandonment for failure to visit and provide support and failure to comply with the requirements contained in the permanency plans. DCS also alleged that termination of Mother's parental rights was in the best interest of the Children.

A hearing was held at which several witnesses testified. Brandie Storm, a DCS employee, testified that she served as the case manager for each of the three children for approximately two and a half years. She recalled that Eva and Christopher had been in the custody of John and Carolyn B. (collectively "Grandparents") from 2007 until their removal, when Grandparents reported that they could no longer handle their behaviors in the home. She related that David also resided with Grandparents for some time until he left to live with Rita W. ("Aunt"). He resided with Aunt until March 2012, when Aunt reported that she

---

[2]Father surrendered his parental rights to Eva. Likewise, Father and Biological Father failed to appear or respond to the termination petition; thus, their remaining respective parental rights were terminated. They are not parties to this appeal.

could no longer handle his behavior. She recalled that Eva was eventually placed with a relative, Jennifer P., while David and Christopher were placed in the same foster home.

Ms. Storm attempted to facilitate visitation, but her attempts were frustrated because Mother was incarcerated for substantial periods of time. When Mother was not incarcerated, Ms. Storm scheduled visitation between Mother and Eva in May 2012 a few times. The Children last visited with Mother in March 2013, when Mother was hospitalized. Ms. Storm asserted that the Children intended to return to the hospital for a second visit, but Mother had been discharged and could not be located. Other than the May 2012 visits with Eva and the March 2013 visit with all three children, Mother never visited the Children. Ms. Storm claimed that Mother had also not maintained regular contact with the Children from 2007 until their respective removal dates. She related that it was "really difficult" to contact Mother, who never maintained a consistent telephone number or location. She asserted that Mother never visited the DCS office to inquire about the Children even though Mother made frequent visits to a nearby office to retrieve food stamps. Ms. Storm provided Mother with her contact information and her supervisor's contact information, but Mother failed to regularly contact her. She acknowledged that Mother was incarcerated at varying times but asserted that Mother was not incarcerated from May 2012 until September 2013.

Relative to child support, Ms. Storm stated that Mother never remitted child support or provided food, clothing, toiletries, or any essential items for the Children while they were in DCS custody. Mother did not even provide any of these items the few times she exercised visitation. Ms. Storm recalled informing Mother of the obligation to provide child support and discussing the requirements contained in the permanency plans. She acknowledged that in the four months preceding the filing of the termination petition, Mother was either homeless or residing in a rehabilitation facility in Nashville. Ms. Storm claimed that she was unaware of Mother's whereabouts at the time because Mother failed to maintain contact with DCS. She attempted to contact Mother through relatives, but the relatives generally did not know Mother's whereabouts either. She also claimed that at one time, Mother said she did not want to speak with her anymore. She stated that if Mother had maintained contact, she could have assisted her in obtaining housing and employment and in facilitating visitation with the Children. In support of her assertions, Ms. Storm identified her affidavit of reasonable efforts that she provided to Mother.

Ms. Storm recalled developing four permanency plans for Mother but acknowledged that Mother was incarcerated when some of the plans were developed. She related that even when Mother was incarcerated, she discussed each plan with her and the requirements contained in each plan. She also advised Mother on at least two occasions regarding the criteria and procedures for termination of her parental rights. Ms. Storm arranged an alcohol and drug assessment, which Mother completed. Mother did not receive any

recommendations for treatment from the assessment, but Mother was required to complete a similar program as a result of her conditions of parole. Mother did not complete the program as required. Ms. Storm claimed that Mother only complied with one drug screening, that Mother never provided any information to establish completion of the psychological assessment, and that Mother had also not resolved her legal issues.

Patsy Croinex testified that she worked with Foothills Care, which provides services for children in foster care. She served as the Children's case manager. She related that the Children were doing really well. She stated that Eva was very smart, was doing well in school, and had made a few friends. She stated that David was doing well in school, was very active in extracurricular activities, and planned to attend Tennessee Tech upon graduation. She stated that Christopher had "come a long way in school" and was doing well and enjoying his recent placement. She claimed that each of the children, especially Eva and David, had expressed a desire for Mother's rights to be terminated.

Mother testified that she was homeless from May 2012 until October 2012, when she was sent to a halfway house in Nashville, Tennessee. She left the halfway house in December 2012 and returned to Crossville, where she lived in a tent until she was admitted to the hospital in February 2013. Shortly thereafter, she returned to Nashville. She stated that at first, she lived in a halfway house before she was incarcerated for approximately 30 days. Upon her release, she attended a rehabilitation center in April 2013 and remained there until she was incarcerated in July 2013. She stated that she had been incarcerated since that time. She stated that while she was incarcerated, she had completed a mental health evaluation and was currently attending another rehabilitation program.

Relative to the Children, Mother acknowledged that she had not maintained regular visitation with the Children since 2007. She explained that she was told that the Children did not want to visit her. She also acknowledged that she had not regularly provided for the Children since 2007 but explained that she was either homeless or incarcerated. She stated that she wrote letters to Eva while she was incarcerated in 2011. She explained that she was unable to call the Children or remit child support because she did not have any money while she was incarcerated. She recalled that she requested visitation in 2011 but that she was told that the Children did not want to visit her. She stated that upon her release, she visited with Eva a few times. She was later told that Eva did not want to visit her anymore. She claimed that she had difficulty contacting Ms. Storm but that Ms. Storm always had a valid contact number for her through her mother. She related that when she was not incarcerated, she spoke with her mother every day. She stated that she left voicemail messages and text messages for Ms. Storm, who never contacted her. She did not have the Children's address or telephone number and could not contact them without assistance from DCS. She

acknowledged that she was employed for approximately three weeks in 2013 but claimed that she did not have enough money to support herself and remit child support.

Mother testified that she sought assistance from DCS in obtaining housing but that DCS never provided assistance. She claimed that upon her release, she planned to obtain employment and live in a homeless shelter until she was able to find housing. She stated that she had several employment options and believed that she could easily find suitable employment. She acknowledged that she had not obtained employment for several years but explained that she was disabled and physically unable to work. She related that she intended to ignore her disability and find suitable employment upon her release. She asserted that Christopher had expressed a desire to live with her upon her release.

Following the presentation of the above evidence, the trial court terminated Mother's parental rights on the statutory ground of abandonment for failure to provide support and failure to visit. The court also found that despite reasonable efforts by DCS to assist Mother, she failed to comply with the requirements contained in the permanency plans. The court likewise found that termination of Mother's parental rights was in the best interest of the Children. This timely appeal followed.

## II. ISSUES

We restate the issues raised on appeal as follows:

A. Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon the statutory ground of abandonment pursuant to Tennessee Code Annotated section 36-1-102(1)(D), (E).

B. Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon her failure to comply with the requirements of the permanency plan pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

C. Whether clear and convincing evidence supports the court's finding of reasonable efforts by DCS pursuant to Tennessee Code Annotated section 37-1-166(g)(1).

D. Whether clear and convincing evidence supports the court's finding that termination of Mother's parental rights was in the best interest of the Children pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149

S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

In terminating Mother's parental rights based upon the statutory ground of abandonment, the court considered Mother's failure to remit support and failure to visit for the four months preceding May 2, 2013, the filing date of the termination petition. Thus, the relevant time period was January 2, 2013 to May 1, 2013. A parent's willful failure to support the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A parent's willful failure to visit the

child "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is defined as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(c).

This court has consistently held that the term willfulness as it applies to a party's failure to support or failure to visit must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.,* 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

1.

Mother concedes that she failed to remit child support during the relevant time period but asserts that her failure to remit support was not willful. She argues that she was unemployed and either homeless, incarcerated, or in a rehabilitation center during the relevant time period. DCS responds that Mother never provided support for the Children even when she was not incarcerated or attending rehabilitation centers. DCS asserts that Mother readily admitted that despite her claims of disability, she was capable of finding employment and that she planned on finding employment shortly after her release.

We acknowledge Mother's inability to maintain housing or employment during the relevant time period. However, this was not a case where a parent had numerous expenses or extenuating circumstances but faithfully provided support when he or she was able. *See In re Dylan H.*, No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 16, 2011) (reversing the trial court's termination decision because mother was simply unable to fulfill her child support obligation during the relevant time period). In this case, Mother never paid child support or even provided token support or gifts since the Children were removed and placed in DCS custody. Mother had also not consistently provided support from 2007 until the time of removal. Even when Mother was employed for a period of approximately three weeks, she failed to remit any form of support for the Children. With

these considerations in mind, we conclude that there was clear and convincing evidence to establish that Mother abandoned the Children by willfully failing to remit child support before, during, and after the relevant time period and that a statutory ground existed for termination of Mother's parental rights.

2.

Mother concedes that she failed to regularly visit the Children but asserts that her failure to visit was not willful. She claims that Ms. Storm failed to arrange visitation or return her telephone calls and that she was repeatedly told that the Children did not want to visit her. DCS responds that Mother failed to maintain communication and that since 2007, Mother only sporadically visited the Children. DCS claims that Mother frequented the adjoining office to retrieve food stamps but failed to even enter the DCS office to inquire about the Children. DCS notes that at one point, Mother even told Ms. Storm she no longer wanted to communicate with her.

The Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *A.M.H.*, 215 S.W.3d at 810 (citing *Swanson*, 2 S.W.3d at 189). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citation omitted). In *A.M.H.*, the Court was "presented with a situation in which the parents of [the child] actively pursued legal proceedings to regain custody [ ] during the 'abandonment' period but failed to visit for a period of four consecutive months immediately prior to the filing of a petition for termination of parental rights." 215 S.W.3d at 810. Unlike the situation presented in *A.M.H.*, Mother visited Eva on a few occasions in 2012 and only exercised visitation with all three children when *they* took the initiative to visit her in the hospital in March 2013. They attempted to visit her a second time in the hospital, but she had been discharged and could not be located. While we acknowledge the Children's reluctance to visit Mother, it was Mother who was consistently difficult to contact. Despite her assertions to the contrary, she never attempted to initiate visitation or even inquire about the Children. If Mother truly had difficulty in contacting Ms. Storm, she could have simply visited the DCS office or sought relief through the court system. With these considerations in mind, we conclude that Mother's sole visit during the requisite time period amounted to nothing more than token visitation because the visitation was of such an infrequent nature. Tenn. Code Ann. § 36-1-102(1)(C). Accordingly, we conclude that there was clear and convincing evidence to establish that Mother willfully failed to visit the Children during the relevant time period. Thus, a second statutory ground existed for termination of Mother's parental rights.

B.

Mother contends that the trial court erred in finding a ground of termination based upon her substantial noncompliance with the permanency plans. Mother alleges that she substantially complied with the requirements as evidenced by her completion of the alcohol and drug assessment and the mental health assessment. She asserts that she also submitted to drug screening. DCS responds that the requirements contained in the permanency plans were reasonable and that while Mother completed some of the requirements, she was in substantial noncompliance as evidenced by her violation of her probation, her current incarceration, and her failure to submit to random drug screening or remit child support.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, 2003 WL 21266854, at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Here, Mother was tasked, in pertinent part, with resolving her criminal issues, refraining from obtaining new charges, remitting child support, completing an alcohol and drug assessment and a mental health assessment, and submitting to random drug screening. These requirements were reasonable and related to remedying the conditions that led to the Children's placement with DCS, namely Mother's inability to parent and the lack of a willing relative placement. Mother simply failed to substantially comply with these requirements. Mother asserts that she completed a mental health evaluation, but she failed to provide any evidence of her adherence to this requirement. We acknowledge that Mother completed the

alcohol and drug assessment and submitted to a few drug screens. However, she simply failed to comply with the most important aspects of the permanency plans, namely to resolve her legal issues and put herself in a position where she could adequately care for the Children. Mother also never remitted child support as required by the permanency plans. Accordingly, we conclude that while Mother attempted to comply with some of the requirements enumerated in the permanency plans, the court's finding that Mother was in substantial noncompliance with the permanency plans is supported by clear and convincing evidence. Thus, a third statutory ground existed for termination of Mother's parental rights.

C.

Although not raised as a specific issue on appeal by Mother, she takes issue with DCS's lack of communication with her. In response, DCS asserts that its efforts in assisting Mother were reasonable given Mother's refusal to maintain communication.

Once a child has been removed, DCS is tasked with making it possible for the child to return home before instituting termination proceedings. Tenn. Code Ann. § 37-1-166(a)(2). At the termination proceeding, DCS must prove by clear and convincing evidence that reasonable efforts were made to reunite the child with the parent. Tenn. Code Ann. § 37-1-166(b). For purposes of DCS's involvement, the term reasonable efforts refers to "the exercise of reasonable care and diligence by the [DCS] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "The reasonableness of [DCS's] efforts depends upon the circumstances of the particular case." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

"While [DCS's] reunification efforts need not be "herculean," DCS must do more than simply provide the parents with a list of services and send them on their way." *Id.* "[DCS employees] must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* These "employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan." *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). In keeping with this ideal, DCS must provide an affidavit, identifying its reasonable efforts, for the court's consideration. Tenn. Code Ann. § 37-1-166(c); *see In re R.L.F.*, 278 S.W.3d at 317. In determining whether the efforts used by DCS were reasonable, the court should consider DCS's affidavit and the following factors:

(1) the reasons for separating the parent from his or her children,

-11-

(2) the parent's physical and mental abilities,

(3) the resources available to the parent,

(4) the parent's efforts to remedy the conditions that required the removal of the children,

(5) the resources available to [DCS],

(6) the duration and extent of the parent's remedial efforts,

(7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and [DCS's] efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519. However, " '[r]eunification of a family is a two-way street, and the law does not require [DCS] to carry the entire burden of this goal." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006) (quoting *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002)). "Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519.

Ms. Storm presented an affidavit documenting her efforts to reunite the Children with Mother. The affidavit reflects her attempts to contact Mother and provide services. Due to Mother's unavailability, the affidavit provides more information regarding the services provided to the Children and the effort needed to encourage the Children to visit Mother when possible. Having reviewed the evidence, we conclude that DCS expended reasonable efforts in attempting to assist Mother, who was difficult to locate, generally unresponsive to assistance from DCS, and never made a corresponding effort to remedy the conditions which led to the Children's placement with DCS.

D.

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Mother's parental rights, we must consider whether termination of her rights was in the best interest of the Children. In making this determination, we are guided by the following non-exhaustive list of factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that

terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Mother. She had not made the adjustment of circumstances necessary to provide a stable home for the Children as evidenced by her incarceration at the time of the hearing. Tenn. Code Ann. § 36-1-113(i)(1), (2). She failed to maintain regular visitation with the Children, who have not otherwise maintained a meaningful relationship with her. Tenn. Code Ann. § 36-1-113(i)(3), (4). The Children reside in safe and stable foster homes, are progressing academically, and doing well. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether Mother can provide a safe and stable home once released from custody. Tenn. Code Ann. § 36-1-113(i)(7). Mother has never remitted child support. Tenn. Code Ann. § 36-1-113(i)(9).

We acknowledge that Mother obviously cared for the Children. However, her inability to parent since 2007 places doubt upon her ability to parent Eva in the few weeks she has remaining as a minor and David and Christopher in the few years they have remaining as minors. Moreover, the Children need permanency and stability, which they have consistently received from sources other than Mother. Accordingly, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Children. We affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Marcia P.

_____
JOHN W. McCLARTY, JUDGE